IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CR119 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| JOSE L. CORRALES-WYANT, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by the defendant Jose L. Corrales-Wyant (Corrales-Wyant) (Filing No. 13). Corrales-Wyant is charged in a one-count indictment with unlawful possession of a stolen firearm (Count I) in violation of 18 U.S.C. § 922(j). Corrales-Wyant seeks to suppress all physical evidence and statements obtained as a result of his detention and arrest on February 5, 2005.

On August 15, 2005, the court held an evidentiary hearing on the motion. Omaha Police Department (OPD) Officer Devin L. Crinklaw (Officer Crinklaw) and OPD Officer David Bruck (Officer Bruck) testified during the hearing. **See** Filing No. 18. The Court received into evidence a rights advisory form (Exhibit 1). **See** Filing No. 19. The transcript of the hearing was filed on August 31, 2005 (TR.). **See** Filing No. 20. Corrales-Wyant filed a brief (Filing No. 14) in support of his motion. The government filed a brief in opposition to the motion (Filing No. 15). Following the hearing, the parties further briefed the issues via correspondence with the court.

**FINDINGS OF FACT**

At the time of the events at issue, Officer Crinklaw was certified as a police officer in the State of Nebraska and had served as a uniformed patrol officer for the OPD for approximately two years (TR. 4-5). Prior to Officer Crinklaw's employment with OPD, he worked for six years with the Douglas County Sheriff's Office as a reserve deputy (TR. 4). At the time of the events at issue, Officer Bruck was certified as a police officer in the State of

Nebraska and had served as a uniformed patrol officer of the OPD for more than six years (TR. 34). Officer Bruck's service with the OPD included a six-month assignment with the gang unit (TR. 34).

On the evening of February 5, 2005, at approximately 9:00 p.m., Officers Crinklaw and Bruck (the Officers) were patrolling the area around the corner of 20th Street and W Street (TR. 5, 21, 34-35, 38). Officer Crinklaw testified the patrol vehicle was unmarked (TR. 5, 21); Officer Bruck testified the patrol vehicle was marked but did not have its sirens or overhead lights in operation (TR. 38). Both of the Officers were in uniform (TR. 15, 35-36). Officer Bruck regularly patrols this area, and Officer Crinklaw occasionally patrols this area (TR. 6). This area of Omaha is known as a high crime area and a "hot spot" for gang activity, including graffiti, shootings and assaults (TR. 6, 9, 35, 37). The Officers were proceeding westbound on W Street (TR. 6-7). At approximately 9:03 p.m., the Officers observed three males walking eastbound on W Street (TR. 6, 26, 34). Corrales-Wyant was one of these three individuals (TR. 8-9).

At the time the Officers initially saw the three individuals, the three individuals were walking eastbound on a stretch of sidewalk east of the residence at 2015 W Street (TR. 6, 26). The residence at 2015 W Street is a known gang member hangout frequented by "very anti-police" individuals, a place where a number of shootings have occurred (TR. 11, 13). At this point, Officer Bruck told Officer Crinklaw that the three males were known Lomoss gang members and that "They need to be checked. This is a high crime area." (TR. 6).

Officer Bruck stopped the patrol vehicle by pulling across the center line and into the eastbound lane (which would have been into oncoming traffic) (TR. 7, 26). Officer Crinklaw recalled that the reason the Officers stopped the patrol vehicle was to stop the three males (TR. 22). The three males were approximately ten to fifteen yards in front of, and proceeding towards, the Officers as the Officers exited their vehicle (TR. 7-8).

Officer Crinklaw testified that after the Officers exited the patrol vehicle and approached the three males, one individual—later identified as Corrales-Wyant—ducked behind the other two individuals (TR. 9-10, 14). Officer Bruck testified that Corrales-Wyant had "faded" behind the other two individuals while the Officers were still in the patrol vehicle,

2

approximately 30-35 feet away from the three individuals, upon the three individuals' seeing the Officers (TR.36, 39). The three individuals paused and hesitated in their steps and the individuals put their hands in their pockets (TR. 10, 39-40). Officer Crinklaw stated that it is common for "parties possibly involved in criminal activity" to put their hands in their pockets "for a number of reason[s]" (TR. 10).

The Officers testified they were immediately concerned for their safety as a result of Corrales-Wyant ducking behind the other two individuals, and the other two individuals putting their hands in their pocket (TR. 10, 38). Upon exiting the patrol vehicle, Officer Bruck recognized Corrales-Wyant as a gang member (TR. 40, 42, 45). The Officers commanded the three individuals to stop (TR. 45, 47). Officer Bruck issued verbal commands, inter alia, "to see everybody's hands," and the three males complied with Officer's Bruck's commands (TR. 12, 39). Further, Officer Bruck testified that individuals were exiting the nearby residence at 2015 W Street (TR. 41). Once the Officers were in the immediate presence of the three males, Officer Crinklaw remembered he had prior contact with one of the two males who was not Corrales-Wyant (TR. 8). After this incident, Officer Crinklaw remembered having prior gang-related contact with Corrales-Wyant (TR. 8-9).

Officer Crinklaw conducted frisks of the three males' persons prior to initiating any conversation with them (TR. 11, 13). Officer Crinklaw explained he conducted the frisks because it was dark outside and the residence at 2015 W Street near the scene of this incident was a known gang member hangout frequented by "very anti-police" individuals, where a number of shootings had occurred (TR. 11, 13). During the pat downs, Officer Crinklaw found a loaded, semi-automatic Raven pistol in the Corrales-Wyant's front left coat pocket (TR. 14-15). The Officers determined the pistol was stolen (TR. 43). Corrales-Wyant was arrested for carrying a concealed weapon and possession of a stolen firearm (TR. 15, 43-44). The Officers took Corrales-Wyant to OPD central headquarters (TR. 16, 44). Corrales-Wyant executed a Rights Advisory Form (Exhibit 1) after Officer Bruck advised Corrales-Wyant of his *Miranda* rights (TR. 16-17, 44-45). The Officers proceed to question Corrales-Wyant (TR. 44).

## ANALYSIS

Corrales-Wyant moves the court to suppress evidence obtained as a result of the frisk of his person on the night of February 5, 2005.  Corrales-Wyant argues the Officers cannot articulate specific facts which, taken together with rational inferences taken from such facts, reasonably warrant the Officers' decision to effectuate the initial stop of Corrales-Wyant on February 5, 2005.  Corrales-Wyant further moves the court to suppress his statements obtained as a consequence of his arrest following the alleged illegal stop and frisk.  The government argues the Officers were justified in conducting the investigatory stop with Corrales-Wyant because the Officers feared for their safety even though the Officers had no other articulable suspicion that criminal activity was afoot.  The government contends that the Officers feared for their safety as the three individuals could have shot at the Officers as the Officers drove past.  The government acknowledges the showing is at the "low end of the threshold," but contends the threshold is met (TR. 54).

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."  U.S. Const. amend. IV.  "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  **Mincey v. Arizona**, 437 U.S. 385, 390 (1978) (**quoting** *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted)).

Though of limited scope and duration, investigative stops are "seizures" for purposes of the Fourth Amendment, and as such investigative stops must be supported by a reasonable, articulable suspicion that criminal activity may be afoot.  **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005); *United States v. Bustos-Torres,* 396 F.3d 935, 942 (8th Cir. 2005).

The only "articulable suspicion" of criminal activity advanced by the government in support of the Officers' decision to make the contact challenged here is that the Officers

feared for their safety. The undersigned magistrate judge agrees that intentionally causing the physical injury of a law enforcement officer would be criminal activity. Giving due respect to the instincts of experienced law enforcement officers, however, the undersigned magistrate judge cannot see how the facts emphasized by the government gave rise to a reasonable suspicion criminal activity was afoot. **See *United States v. Gray***, 213 F.3d 998, 1001 (8th Cir. 2000).

At the suppression hearing, the government presented evidence that the Officers observed Corrales-Wyant duck behind the two individuals with whom he was walking, and that the two individuals put their hands in their pockets. When a group of three adult males are walking on a sidewalk at night, there can be any number of possible explanations for one individual falling behind the other two. Even if such action was taken to evade being seen by a person driving an oncoming vehicle, the government failed to present conclusive evidence at the suppression hearing that Corrales-Wyant knew that the oncoming vehicle was a patrol vehicle. The government did not prove the patrol vehicle was marked as a law enforcement vehicle. Moreover, it was 9:00 p.m. in February—making it nearly impossible that the three individuals could have identified the vehicle's occupants as OPD officers because of any insignia on the Officer's uniforms. Furthermore, while it may be, as Officer Crinklaw testified, that placing one's hands in one's pockets is a common action by a suspect when faced with a law enforcement officer, the government admitted this incident occurred on a cold, dark February night. "Too many people fit this description for it to justify a reasonable suspicion of criminal activity." *Id.* (**quoting *United States v. Eustaquio***, 198 F.3d 1068, 1071 (8th Cir. 1999)). Nor did the government present evidence regarding the risk of the Officers being victims of violence. The Officers did not testify that they feared being the targets of gun violence as they drove past the three individuals. Nor did the government present evidence of shootings at or assaults or batteries upon law enforcement officers at the residence at 2015 W Street, on that block of W Street, in the general area the Officers were patrolling, or even in the City of Omaha generally. A general categorization of a neighborhood, or even the particular residence, as being a gang hangout is not sufficient to prove an "articulable suspicion" of criminal activity may be afoot. From the paucity of evidence presented, the

5

undersigned magistrate judge cannot find that any such articulable suspicion of criminal activity was reasonable and concludes the initial investigatory stop was made in violation of the Fourth Amendment.

The case law cited by the government in support of its arguments is not persuasive. The government argues that, at least in the Eighth Circuit, law enforcement officers need not satisfy the requirement that they have reasonable suspicion that criminal activity is afoot <u>to initiate</u> a *Terry* stop. Despite the government's representations to the contrary, the holdings in *Minnesota v. Dickerson*, 508 U.S. 366, 368 (1993); *United States v. Hanlon*, 401 F.3d 926 (8th Cir. 2005); *United States v. Shranklen*, 315 F.3d 959 (8th Cir. 2003); and *Gray*, cited *supra*, do not support this argument, and instead reinforce the undersigned magistrate judge's conclusion of law that the contact initiated by the Officers was in violation of Corrales-Wyant's Fourth Amendment rights.

In *Dickerson*, the United States Supreme Court notes that the respondent in that appeal did not challenge "the finding made by the trial court and affirmed by both the Court of Appeals and the State Supreme Court that the police were justified under *Terry* in stopping him." 508 U.S. at 377. In that case, the law enforcement officers saw the defendant exit an apartment building known to be a notorious "crack house." *Id.* at 368. One of the officers had responded to complaints of drug sales in that building's hallways on multiple prior occasions, and had assisted in executing multiple search warrants at that building. *Id.* After making eye contact with one of the officers, the defendant "abruptly halted and began walking in the opposite direction." *Id.* at 369. These facts are easily distinguishable in from the present case. The Court's findings include an articulable crime, that is illegal drug distribution, at a location where the officer had personal knowledge of the occurrence of that crime. *Id.* at 368. In the instant case, the government presented no evidence of crimes against law enforcement in this general area, though it did present evidence that the area was known for gang violence generally. Furthermore, the defendant's act of halting and continuing to walk in the **opposite** direction was objectively evasive, an effort to avoid contact with the law enforcement officers. In the instant case, the three individuals' actions are **not** objectively evasive—two individuals putting their hands in their coat pockets on a cold, February night, and one individual falling

behind two individuals with whom he is walking. Finally, the *Dickerson* case does not involve a question of whether the defendant knew the individual he made eye contact with was a law enforcement officer. In *Dickerson*, the Officers were in a marked squad car. *Id.* 368. In the present case, the government did not prove that the actions by the three individuals were the result of the individuals' seeing the Officers. The Officers' testimony was inconsistent as to whether the patrol vehicle they were driving on February 5, 2005, was marked or unmarked. The Officers' testimony also contradicted as to whether the individuals' actions occurred before or after the Officers exited the patrol vehicle. Therefore, the holding in *Dickerson* as to whether the law enforcement officers' search in that case exceeded the scope permitted by *Terry* is not relevant to this case because the court cannot consider the legality of the challenged search's scope until a reasonable, articulable suspicion for initiating the stop is found.

The government cites to *Hanlon* and *Shranklen* in an attempt to persuade the court that the Officers had not needed a reasonable articulable suspicion that criminal activity was afoot to initiate the investigatory stop, because the Officers felt their safety was threatened. Again, the cases cited by the government do not support this proposition. In *Hanlon*, the defendant did not challenge the propriety of law enforcement's investigatory stop—the law enforcement officer had initiated the investigatory stop because the defendant had failed to use the vehicle's signal to signal a turn. 401 F.3d at 928 (noting the established precedent that "traffic violations—however minor—constitute sufficient probable cause to stop a vehicle") (citation omitted). *Shranklen* similarly involves "the search of a vehicle that had been lawfully pulled over for an investigative stop." 315 F.3d at 959. These cases do not help the government overcome its failure to prove the suspected criminal activity articulated by the Officers was reasonable.

Finally, the government's reliance on *Gray* is misplaced; the United States Court of Appeals for the Eighth Circuit's holding in *Gray* further supports the legal conclusions set forth herein. In *Gray*, the court held the defendant's motion to suppress was wrongly denied by the district court because law enforcement officers lacked reasonable suspicion that criminal activity was afoot when they frisked the defendant. 213 F.3d at 999. At approximately 9:45 on

a January night, two law enforcement officers were patrolling a neighborhood in St. Louis, Missouri, known for drug activity and prostitution. *Id.* at 1000. The law enforcement officer stated that, at seeing the law enforcement officers, the defendant crossed the street "in a hurried fashion" and continued on in the same direction. *Id.* The officers drove around the block and found the defendant stationary, so they approached the defendant for a "consensual stop." *Id.* The Eighth Circuit Court of Appeals held the officer did not have a reasonable suspicion criminal activity was afoot when he frisked the defendant and thus a Fourth Amendment Violation had occurred. *Id.* ("Viewed in their totality, the circumstances cited by the government do not support a finding of reasonable suspicion."). The court did not expand *Terry*; instead central principles of *Terry* were reiterated: "A protective frisk is constitutionally reasonable when a police officer 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" *Id.* (**quoting *Terry***, 392 U.S. at 30). As in *Gray*, the instant case involves the individuals' actions of walking down a street on a cold winter night. The "unusual conduct" in this case is even more innocent, and less evasive, than in *Gray*: two individuals' putting their hands in their pockets, and one individuals' falling behind the other two. Such conduct is not so unusual or improbable that it can reasonably be viewed as "a pretext for criminal activity." *Id.* at 1001. Therefore, the undersigned magistrate judge recommends the evidence discovered as a result of the pat down on February 5, 2005, be suppressed.

Because Corrales-Wyant was subject to an illegal seizure, the court must determine whether his subsequent statements should be excluded on that basis. The government did not address this issue. The exclusionary rule prohibits the admission of evidence unconstitutionally obtained. ***Weeks v. United States***, 232 U.S. 383 (1914). The rule also applies to tangible and testimonial evidence which was derived directly or indirectly from unconstitutionally obtained evidence, in other words, evidence that is "fruit of the poisonous tree." ***Wong Sun v. United States***, 371 U.S. 471, 487 (1963); ***Nardone v. United States***, 308 U.S. 338 (1939); ***Silverthorne Lumber Co. v. United States***, 251 U.S. 385 (1920);

*United States v. Fellers*, 397 F.3d 1090, 1094 (8th Cir. 2005). As explained by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590 (1975):

> Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S., at 486. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.
>
> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. **See *Davis v. Mississippi***, 394 U.S. 721, 726-727 . . . (1969). Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." **See *Mapp v. Ohio***, 367 U.S. [643,] 648 [(1961)].

*Id.* at 601-03 (footnote omitted).

Even though the exclusionary rule may require the exclusion of all evidence obtained by exploitation of an illegal search and seizure, the evidence gained may still be admissible if it was gained by means sufficiently distinguishable to be purged of the primary taint of the illegality. To that extent, three general exceptions have been carved from the exclusionary rule. First the "attenuated connection" exception applies where the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument that exclusion of the evidence is not warranted. **See *Wong Sun***, 371 U.S. at 487-88; *Nardone*, 308 U.S. at 338. Second, the "independent source" exception applies where evidence is admissible if the government can show it derived the evidence from a lawful

source independent of the illegal conduct giving rise to the primary taint. **See** *Silverthorne Lumber Co.*, 251 U.S. at 385. Third, the "inevitable discovery" doctrine applies where the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint. **See** *Nix v. Williams*, 467 U.S. 431 (1984).

The government presented no evidence or argument that the latter two exceptions would apply. As to the attenuated connection doctrine, the *Brown* court identified four factors relevant to the determination of whether statements made to the police after an illegal seizure are admissible or sufficient to constitute voluntary consent: 1) whether the suspect has been advised of his *Miranda* rights prior to making the statements at issue; 2) the temporal proximity of the statements to the Fourth Amendment violation; 3) the existence of intervening causes between the violation and the statements; and 4) the purpose or flagrancy of the official misconduct. *Id.* at 603-04. Demonstrating a confession was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion" is, of course, a function of circumstantial evidence, with the burden of persuasion on the state. *Kaupp v. Texas*, 538 U.S. 626, 632-33 (2003) (**quoting** *Wong Sun*, 371 U.S. at 486).

The court finds that in applying the *Brown* factors, the government has not carried its burden to show that Corrales-Wyant's statements were "sufficiently an act of free will to purge the primary taint of the [illegality]." *Wong Sun,* 371 U.S. at 486. Corrales-Wyant's statements were made with the benefit of *Miranda* warnings. Exhibit 1. This factor is not, however, dispositive. **See** *Kaupp*, 538 U.S. at 633 (noting that although *Miranda* warnings are an important factor, they are, standing alone, insufficient for Fourth Amendment purposes, to break the causal connection between an illegality and the confession); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004). The temporal proximity factor weighs in favor of finding a Fourth Amendment violation: the Officers initiated the stop at approximately 9:03 p.m. (TR. 34). The Officers initiated the interrogation and advised the defendant of his *Miranda* rights at 9:35 p.m. Exhibit 1. Only approximately thirty minutes elapsed from the time Corrales-Wyant was stopped until he was sitting in an interrogation room at OPD central headquarters receiving his *Miranda* rights. The entire interview was

completed within one hour of the initial stop. Exhibit 1. The court finds such a short duration of time could not have expunged the encounter of the taint of the illegal seizure. **Compare Taylor v. Alabama**, 457 U.S. 687, 691 (1982) (holding a confession that followed illegal arrest by six hours was not sufficiently attenuated where suspect remained in police custody, was unrepresented by counsel, had been questioned on several occasions, fingerprinted, and subjected to a lineup); **Brown**, 422 U.S. at 604-05 (holding a confession that followed illegal arrest by two hours was not sufficiently attenuated where the arrest itself was a blatantly improper "expedition for evidence" and no intervening event of any significance occurred between the time of the arrest and the confession), **with Rawlings v. Kentucky**, 448 U.S. 98, 107-08 (1980) (holding the relatively nonthreatening, congenial atmosphere of a forty-five minute detention that preceded a statement outweighed the illegal detention); **Hernandez-Hernandez**, 384 F.3d at 565 (holding **Miranda** warning purged the taint of illegality where defendant stayed five days in jail, and subsequent questioning of different substance, location and with different officers than involved in initial illegal questioning). The court can find no intervening actions that separate any admissions from the illegality; even the Officers who conducted the illegal investigatory stop were precisely the two officers that conducted the interrogation back at the OPD central headquarters.

Finally, the undersigned magistrate judge finds the impropriety of the Officers' conduct is highlighted by the language used by Officer Bruck in deciding to conduct the investigatory stop. Officer Bruck did not indicate fear of imminent gun violence perpetrated against the Officers, or identify any other articulable criminal activity. Instead, he said: "They need to be checked. This is a high crime area." Evidence of this rationale for initiating an investigatory stop and conducting an immediate frisk of Corrales-Wyant's person, in light of the paucity of other evidence, leads to the conclusion that the investigatory stop and frisk of Corrales-Wyant on February 5, 2005, was a clear violation of Corrales-Wyant's rights as guaranteed by the Fourth Amendment. The undersigned magistrate judge recommends any statements made by Corrales-Wyant during his initial interview at the OPD central headquarters be suppressed.

Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON** that: defendant Jose L. Corrales-Wyant's motion to suppress (Filing No. 13) be granted.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 17th day of October, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge